UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAI Y. SMALLWOOD
9A Rue Saint Antoine
13002 Marseille, France
U.S. mailing address:
14 Duchess Court
Rosedale, Maryland 21237,

Plaintiff,

v.

ADAM G. THIBODEAU
2819 21st Road S
Arlington, Virginia 22204,

SHAWNTIA FREEMAN
1709 Trinidad Avenue NE, Unit 2
Washington, D.C. 20002,

OFFICER MORENO (first name unknown),
in an individual capacity,

and

OFFICER TRAN (first name unknown),
in an individual capacity,
both of the Metropolitan Police Department,
Fifth District, 1805 Bladensburg Road NE
Washington, D.C. 20002,

Defendants.

Case: 1:26–cv–03854 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 10/21/2026
Description: Pro Se Gen. Civ. (F–DECK)

Civil Action No. ______________

# VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1. This action arises from the secret recording of a mother speaking to her two young daughters inside her own home, and from the conduct that surrounded it. While a Civil Protection Order required Defendant Adam G. Thibodeau to stay at least 100 yards away from Plaintiff's home, he arranged for Plaintiff's landlord and across-the-hall neighbor, Defendant Shawntia Freeman, to watch for Plaintiff and report to him. Ms. Freeman's hallway camera recorded, with sound, Plaintiff's words to her daughters inside the apartment. Ms. Freeman gave



RECEIVED
OCT 21 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

the recording to Mr. Thibodeau, who passed it on and used it. On the same night, after Plaintiff had told two police officers about the protection order and told them that Mr. Thibodeau was not to enter her apartment, Defendants Officer Moreno and Officer Tran let him in anyway and stood by while he took her pets and their belongings.

2. Plaintiff brings claims under the federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520; 42 U.S.C. § 1983 and the Fourth Amendment; the District of Columbia wiretap statute, D.C. Code §§ 23-542 and 23-554; and District of Columbia common law for intentional infliction of emotional distress, trespass, and conversion. Plaintiff does not seek a divorce, alimony, or custody decree, and does not ask this Court to review, modify, vacate, or enforce any custody or protection order or any other judgment of the Superior Court. None of her injuries was caused by a court judgment. She seeks damages and related relief for Defendants' own conduct outside any courtroom, and refers to the custody and protection orders only to show what those orders did and did not authorize.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because Counts I through III arise under 18 U.S.C. §§ 2511 and 2520, and Counts VIII and IX arise under 42 U.S.C. § 1983 and the Fourth Amendment. It has supplemental jurisdiction over Counts IV through VII under 28 U.S.C. § 1367(a) because those claims arise from the same facts and form part of the same case or controversy. The entry and taking underlying Counts VI and VII are the same events underlying Counts VIII and IX.

4. Venue lies in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). A substantial part of the events giving rise to the claims occurred here: the interception, Ms. Freeman's disclosure, the officers' decision to let Mr. Thibodeau into Plaintiff's apartment, and his entry and taking of her property.

5. This Court has personal jurisdiction over Ms. Freeman, who resides in the District of Columbia, and over Officers Moreno and Tran, who serve in the District of Columbia and

committed the acts alleged here. It has personal jurisdiction over Mr. Thibodeau under D.C. Code § 13-423(a)(3) because he caused tortious injury in the District of Columbia by acts he committed here: entering Plaintiff's apartment and removing her property; disclosing the recording's contents to his counsel and the guardians ad litem in a District of Columbia proceeding; and using the recording in the Superior Court of the District of Columbia. His claims arise from those acts.

**PARTIES**

6. Plaintiff Tai Y. Smallwood resides at 9A Rue Saint Antoine, 13002 Marseille, France. Her United States mailing address is 14 Duchess Court, Rosedale, Maryland 21237. From June 2023 through March 8, 2025, she rented Apartment 1 at 1709 Trinidad Avenue NE, Washington, D.C. 20002 (the "Apartment").

7. Defendant Adam G. Thibodeau resides in Arlington, Virginia. He is the father of Plaintiff's daughters, S.T. and L.T. Under Fed. R. Civ. P. 5.2(a)(3), the children are identified by their initials.

8. Defendant Shawntia Freeman resides at 1709 Trinidad Avenue NE, Unit 2, Washington, D.C. 20002, directly across the hall from the Apartment. She has testified that she was Plaintiff's landlord. (Trial Tr., *Thibodeau v. Smallwood*, No. 2023 DRB 001142 (D.C. Super. Ct. May 1, 2025) ("May 1 Tr."), at 130:20–24, 131:22–24.)

9. Defendant Officer Moreno, whose first name and badge number are not yet known to Plaintiff, is an officer of the Metropolitan Police Department ("MPD"), Fifth District, 1805 Bladensburg Road NE, Washington, D.C. 20002. Defendant Officer Tran, whose first name and badge number are not yet known to Plaintiff, is an MPD officer of the same district. On January 20, 2025, each was on duty, in uniform, and acting under color of the law of the District of Columbia. Each is sued in an individual capacity. Plaintiff will amend to state their full names and badge numbers once she obtains them.

## FACTS

*The Civil Protection Order.*

10. On August 21, 2023, after an adjudicated hearing, the Superior Court of the District of Columbia found good cause to believe that Mr. Thibodeau had committed a criminal offense against Plaintiff and entered a Civil Protection Order in her favor against him, No. 2023 CPO 001682 (the "CPO"). It was in force through August 20, 2025. It ordered him to stay at least 100 yards away from Plaintiff's home, with no exception for her home. It ordered him not to commit crimes against her or her animals. It ordered him not to contact her "in any other manner, either directly or indirectly through a third party," except through a co-parenting application about the children and as needed for litigation. It awarded him no animal. A copy, with birth dates redacted, is Exhibit A. On the advice of her domestic-violence counselor, Plaintiff gave a copy of the CPO to Ms. Freeman, her landlord, so that Ms. Freeman would know that Mr. Thibodeau was ordered to stay away from Plaintiff's home. Ms. Freeman therefore knew of the CPO and its terms throughout the events described below.

11. A second order was also in force. On December 3, 2024, in *Smallwood o/b/o S.T. v. Thibodeau*, No. 2024 CPO 004508, the Superior Court entered a Temporary Protection Order requiring Mr. Thibodeau to stay at least 100 yards away from S.T.'s person and home and from S.T. and L.T., and not to contact S.T. "in any other manner, either directly or through a third party." On December 17, 2024, the court extended it until January 28, 2025. A copy, with the children's identifying information redacted, is Exhibit E. On January 15, 2025, the custody court awarded Mr. Thibodeau temporary sole custody of the children and directed that its order be filed in No. 2024 CPO 004508 "as a modification of the governing protection order." (Temporary Custody Order at 5, No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 15, 2025).) That order did not modify or lift the CPO in No. 2023 CPO 001682, which continued to protect Plaintiff and her home; it noted "this Court's finding of an intrafamily offense by Mr. Thibodeau against Ms. Smallwood." (*Id.*)

*Plaintiff leaves the Apartment.*

12. In December 2024, Plaintiff believed she was being watched at her home and feared for her safety. On December 30, 2024, she began staying elsewhere, but she remained the tenant and in possession of the Apartment until she finished moving out on March 8, 2025. Although a judgment for possession had been entered against her in a landlord-tenant case, no writ of restitution was ever executed against her, and she remained in lawful possession. Throughout that period her furniture, belongings, and, until January 20, 2025, her pets remained in the Apartment, and she returned to it regularly to pack and remove her things.

*The landlord reports to Mr. Thibodeau.*

13. Mr. Thibodeau contacted Ms. Freeman. He testified that Ms. Freeman "was kind of informing me of what she's been seeing and observing," including Plaintiff "filling cars up with stuff and belongings and driving off and coming back," and that he told her: "if you see the girls, there was a bench warrant for her arrest. Let me know and stuff." (May 1 Tr. 86:18–87:6.) The bench warrant he referred to had issued in the custody case on January 15, 2025, at a hearing that Plaintiff attended remotely and under oath, rather than in person, from Pennsylvania, where a court had entered an emergency protection order for her and the children two days earlier. (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 15, 2025), at 2:22–3:19, 7:6–11, 10:1–2.)

14. Ms. Freeman did as he asked. On the evening of January 20, 2025, she called Mr. Thibodeau to report: "she's here, she's present, and she has the girls." (May 1 Tr. 87:9–12.) The next day, Mr. Thibodeau's counsel confirmed it to the Superior Court: "She returned to her apartment, packing stuff. . . . [M]y client received a phone call from the landlord saying, she's here. And she alerted the police." (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 21, 2025), at 5:25–6:3.) Plaintiff and her daughters had arrived at the building about twenty minutes before the police did. To reach the Apartment they walked up the stairs past Ms. Freeman's motion-activated hallway camera. Mr. Thibodeau testified that the landlord called him around 6:00 p.m., that he told her to "call the police," and that the police arrived "within 10 to 20

minutes." (May 1 Tr. 87:9–14.) On information and belief, Ms. Freeman learned that Plaintiff had arrived, and that her daughters were with her, from her hallway camera, and the camera recorded their arrival. The recording Ms. Freeman later produced begins only when the police arrived. (*Id.* at 134:5–7.)

15. The reports did not end that night. On March 3, 2025, Mr. Thibodeau's counsel told the Superior Court that Mr. Thibodeau "was receiving updates from the landlord regarding her packing just a moment before." (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Mar. 3, 2025), at 6:7–8.) Thus, on Mr. Thibodeau's own account through counsel, six weeks after January 20 Ms. Freeman was still monitoring Plaintiff's activities at her home and reporting them to the man a court had ordered to stay away from that home. On information and belief, she reported to him on other occasions between those dates as well.

*The interception.*

16. Ms. Freeman installed Ring cameras at the building, including one "in the hallway at the top of the stairs," outside the Apartment. (May 1 Tr. 132:3–8.) The hallway camera recorded sound as well as images. (*Id.* at 193:3–6.) It was motion-activated. (*Id.* at 134:1–7.) On information and belief, the camera's audio recording can be turned off by its owner, and Ms. Freeman knew her hallway camera recorded sound and chose to keep audio recording on. The camera's microphone captured speech from inside the Apartment, beyond the hallway it was installed to monitor.

17. Ms. Freeman's recording of Plaintiff that evening was not an accident of building security. She was watching for Plaintiff that evening at Mr. Thibodeau's request, and she used what her camera showed her to report Plaintiff's presence to him. She kept audio recording enabled. Afterward, she went into her Ring application, retrieved the recording of Plaintiff and her daughters, reviewed it ("I felt weird about the video") and gave Mr. Thibodeau "the whole thing," sound included, together with a second video. (May 1 Tr. 133:6–25, 134:12–15, 193:3–

6.) She acquired and kept the contents of Plaintiff's words to her daughters deliberately, for the purpose of passing them to Mr. Thibodeau.

18. On the evening of January 20, 2025, two MPD officers, Officers Moreno and Tran, came to the building and arrested Plaintiff on the January 15 bench warrant. The Superior Court quashed the warrant the next day. (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 21, 2025), at 7:9–14.) Plaintiff contends the warrant should never have issued: the court did not communicate with the Pennsylvania court before issuing it, and the presiding judge later acknowledged, "If I had it to do over again, I would have called you." (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 16, 2025), at 6:13–19.) That question is not presented here. This action seeks relief for the recording and for Defendants' own conduct.

19. That evening, after the officers arrived, Plaintiff was inside the Apartment with S.T. and L.T., then ages eight and five. The Apartment door was open. Plaintiff and her daughters were in the Apartment's living room. When Plaintiff spoke to her daughters, the officers were downstairs at the building's front entrance, not in the upstairs hallway, and none was speaking with her. At other points during the encounter, officers spoke with Plaintiff, and she answered them. The officers later came up to the Apartment and arrested Plaintiff inside it. The arrest took place inside a private residence, not in public. In her living room, turned toward her daughters and away from the door, in an ordinary speaking voice, Plaintiff spoke to her daughters, including telling them what to do if anyone hurt them. Those words were addressed only to her children, not to anyone in the hallway, and not to the officers. They were personal and protective: a mother's instructions to her young daughters about their own safety. A guardian ad litem later quoted them as words Plaintiff spoke to S.T. (Trial Tr., No. 2023 DRB 001142 (D.C. Super. Ct. May 2, 2025) ("May 2 Tr."), at 60:16–20.)

20. Plaintiff did not know that a device in the hallway was recording sound from inside her home, and nothing at the building disclosed that the hallway camera recorded audio. She spoke expecting that her words to her children were not being recorded, and that expectation was justified: she was inside her own home, speaking to her own children. Whatever risk she ran that

someone passing in the hallway might overhear some of her words through the open door, she did not expect, and had no reason to expect, that the hallway camera's microphone would capture and preserve thirty minutes of her conversation with her children for later playback. This action concerns Plaintiff's words to her daughters, not anything she said to the officers.

21. The hallway camera captured those words. The recording runs approximately thirty minutes. (May 1 Tr. 87:21–23, 133:10–11, 133:23–25.) It contains, in audio, Plaintiff's words to her daughters inside the Apartment. (May 2 Tr. 60:11–20.) Ms. Freeman was not a party to that conversation. Plaintiff did not consent to its recording, and neither did any other party to it.

22. Ms. Freeman retrieved the recording from her Ring application. (May 1 Tr. 133:6–7.) The copy she gave Mr. Thibodeau included the audio. (*Id.* at 193:3–6.)

*The disclosure.*

23. Ms. Freeman gave the recording to Mr. Thibodeau. In her words: "I felt weird about the video, so I gave it to Adam himself." (May 1 Tr. 133:14–17.) She gave him "the whole thing," and more than one video. (*Id.* at 133:22–25, 134:12–15.) Mr. Thibodeau confirmed that she "shared with me this 30-minute video." (*Id.* at 87:19–23.) That disclosure was made privately, from one individual to another, and not in or to any court.

24. Mr. Thibodeau testified that Ms. Freeman told him about the camera after the events of that evening. (May 1 Tr. 87:19–21.) He watched the recording. (*Id.* at 196:24–197:1.) It plainly records, from a hallway camera, Plaintiff's voice from inside her home speaking to the children. He knew that Ms. Freeman was not a party to Plaintiff's conversation with her daughters. On information and belief, he also knew that Plaintiff did not know the camera was recording her, and that no party to the conversation had consented to its recording. He gave no consent to the recording before it was made, on behalf of the children or otherwise. He therefore knew, or had reason to know, that the recording was obtained through the interception of an oral communication.

25. Mr. Thibodeau gave the recording to his attorney. On February 3, 2025, his attorney told the Superior Court: "We have the recording of the entire event." (Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Feb. 3, 2025), at 7:1–2.) The recording was later labeled as a guardian ad litem exhibit, "GAL 49," and was placed on box.com for the trial. (May 1 Tr. 87:24–25, 132:11–13, 196:11–15.) On information and belief, these disclosures occurred in the District of Columbia. These disclosures to his counsel, to the guardians ad litem, and by upload to a file-sharing service took place outside any courtroom, before any court ruled on the recording.

*The use.*

26. At the custody trial on May 1, 2025, which Plaintiff did not attend, Mr. Thibodeau's counsel offered the recording, which was identified as "Plaintiff's 16 or GAL's 49." (May 1 Tr. 87:24–25, 192:22–23.) The court vacated its earlier admission of the recording. (*Id.* at 89:9–90:3.) It received the recording after Ms. Freeman testified for Mr. Thibodeau. (*Id.* at 134:19–135:4.) Mr. Thibodeau's counsel then had it played and directed the court to the portion he considered "most telling." (*Id.* at 194:3–5, 195:5–7, 196:17–20.) No one at that trial raised, and the court did not decide, whether the recording had been lawfully obtained. Federal law bars receiving the contents of an unlawfully intercepted communication in evidence in any court proceeding, 18 U.S.C. § 2515, and the Wiretap Act contains no exception for disclosure or use in litigation. The custody trial was a closed proceeding, not open to the public. On information and belief, the recording has never been published, and its contents are not common knowledge or public information.

27. The next day, a guardian ad litem's closing argument quoted Plaintiff's words to her daughters from the recording. (May 2 Tr. 60:10–20.)

*Plaintiff refuses consent, and the officers let Mr. Thibodeau in anyway.*

28. Officers Moreno and Tran were the only officers at the building on January 20, 2025. They came to execute the bench warrant. They arrested Plaintiff inside the Apartment and removed her from it.

29. Before she was taken from the Apartment, Plaintiff told Officers Moreno and Tran that she had a Civil Protection Order against Mr. Thibodeau. She told them that he was there only to collect the children, and that he was not to come into her apartment at all. The officers nodded in agreement. Plaintiff did not consent to Mr. Thibodeau's entry into her home, and she expressly refused it.

30. After Plaintiff had been arrested and removed, Mr. Thibodeau came to the building and entered the Apartment. (May 1 Tr. 90:5–8, 91:17–20.) Despite Plaintiff's express refusal, and knowing of the CPO, Officers Moreno and Tran allowed him to enter. An MPD lieutenant later referred in writing to "Officers Moreno and Tran allowing Mr. Thibodeau to enter your apartment." (Email from Lt. Zunnobia Hakir, MPD Fifth District, to Plaintiff (Jan. 26, 2025), Exhibit F.) No one with authority to consent on Plaintiff's behalf consented. The officers had no authority to consent for her, and no authority to override her refusal.

31. Nothing authorized the entry. The bench warrant authorized only Plaintiff's arrest. The CPO required Mr. Thibodeau to stay at least 100 yards away from her home; its only exceptions allowed him near Plaintiff and her vehicle during exchanges of the children and as necessary for litigation, and neither covered her home. The January 15, 2025 custody order allowed Mr. Thibodeau to "seek the assistance of law enforcement officials" in "the location and retrieval of the minor children"; it did not authorize him to enter Plaintiff's home or to take her property, and it did not authorize the police to let him do so. (Temporary Custody Order at 6, No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 15, 2025).) Acting under color of those orders, the officers' task was to hand S.T. and L.T. to Mr. Thibodeau. That task did not require him to enter the Apartment. Once Plaintiff had been arrested and removed, the warrant had been fully executed, and the officers had no further authority to be inside her home or to admit anyone to it. The Apartment was not abandoned: it was Plaintiff's home, in her lawful possession, with her furniture and belongings inside, and the officers could simply have closed and secured it. The children were in the Apartment's living room, right by the front door, and could be brought to the door and handed to Mr. Thibodeau without his entering. They did not need anything from inside:

they had their own belongings at Mr. Thibodeau's house. No emergency inside the Apartment required anyone to enter it after Plaintiff had been removed.

32. Mr. Thibodeau knew that the CPO barred him from Plaintiff's home and that Plaintiff had not consented to his entry. He did not enter at any officer's direction. By his own account, the decision to take the animals was his own, made on the spot. (May 1 Tr. 91:1–8.) He used the officers' presence and permission to do what the CPO forbade and Plaintiff had refused.

33. Ms. Freeman's camera recorded his visit as well. She testified that she sent him a separate "video of him picking up the kids." (May 1 Tr. 134:12–15.) The only exhibit identified at the custody trial as a Ring video was the thirty-minute recording, GAL 49. (May 1 Tr. at 3 (exhibit index).)

*The taking.*

34. Mr. Thibodeau went past the living room, where the children were, into the children's bedroom, where the animals and their things were kept. No testimony gave any reason for his going there other than to take the animals and their things. He took Plaintiff's two cats and her rabbit from the Apartment, along with their supplies and equipment, including their dishes, and brought them to his home in Virginia. (May 1 Tr. 90:7–91:16.) Officers Moreno and Tran stood by and allowed him to do so.

35. The officers told Plaintiff that they allowed this because otherwise they would have called to have the animals picked up by an animal shelter. No emergency required the animals to go anywhere, let alone to Mr. Thibodeau, the one person a court had barred from Plaintiff's home. The animals had food, water, and litter. Plaintiff had already arranged for a friend to care for them, and her friend was on her way. Plaintiff was released at about 1:00 p.m. the next day, January 21, 2025, the same day the warrant was quashed. Had the officers asked her, or simply secured the Apartment, she or her friend could have cared for them.

36. The animals were Plaintiff's. She adopted the cats in her own name through a PetSmart adoption, and she has the signed adoption record in her name. She acquired the rabbit

in November 2024 and bought its cage and food herself. (Exhibit G.) Plaintiff and Mr. Thibodeau divorced in August 2022. Plaintiff acquired every one of the animals after the divorce, so they were never marital property. Mr. Thibodeau has never claimed the animals as his own. He testified that they were "these girls' animals." (May 1 Tr. 91:1–3.) Ownership was therefore never in dispute between Plaintiff and Mr. Thibodeau, and no court needed to decide it. Plaintiff never gave the animals to S.T. or L.T., or to anyone else. The adoption was in Plaintiff's name, not the children's; Plaintiff paid for the animals, their food, and their supplies; and the children, then eight and five, never paid for, acquired, or took sole responsibility for any of them. The girls also had pets at Mr. Thibodeau's house. Each household kept its own pets: during ordinary custody exchanges, Plaintiff never took the animals from Mr. Thibodeau's house, and the animals in Plaintiff's home stayed there. In December 2024, about a month before January 20, 2025, Mr. Thibodeau was arrested and held in custody. Plaintiff did not go to his house and take the pets kept there. The girls loved the animals, as children love family pets, but the animals were Plaintiff's property, kept in her home and cared for by her. Even if the children had any interest in the animals, Plaintiff had possession of them and the right to possess them in her home, and Mr. Thibodeau had none. Custody of the children did not give him any right to take property from Plaintiff's home. No court order awarded him possession or control of any animal: the custody orders address only the children, and the CPO awarded him nothing. He has not returned them. Plaintiff promptly sought contempt sanctions in the Superior Court for the entry and the taking. No court has decided the merits of that request.

*Injury.*

37. Defendants' conduct deprived Plaintiff of the safe use of her home. It exposed a private moment between a mother and her young children, at one of the worst moments of their lives, to people outside the family. It caused Plaintiff severe emotional distress, humiliation, and fear for her safety, and it cost her her pets and their belongings.

38. This action is filed within two years of January 20, 2025.

**COUNT I: INTERCEPTION (18 U.S.C. §§ 2511(1)(a), 2520), AGAINST DEFENDANT FREEMAN**

39. Plaintiff incorporates paragraphs 1 through 38.

40. Plaintiff's words to her daughters inside the Apartment were an "oral communication" within 18 U.S.C. § 2510(2): she uttered them exhibiting an expectation that they were not subject to interception, under circumstances justifying that expectation.

41. Ms. Freeman intentionally intercepted that oral communication by acquiring its contents through an electronic device, her audio-enabled hallway camera, without the consent of any party, as alleged in paragraphs 16–17. This violated 18 U.S.C. § 2511(1)(a).

42. Plaintiff is a "person whose . . . oral communication is intercepted" and may recover under 18 U.S.C. § 2520.

**COUNT II: DISCLOSURE (18 U.S.C. §§ 2511(1)(c), 2520), AGAINST DEFENDANTS FREEMAN AND THIBODEAU**

43. Plaintiff incorporates paragraphs 1 through 38.

44. Ms. Freeman intentionally disclosed the contents of the oral communication to Mr. Thibodeau, knowing that she had obtained it through her own interception. That disclosure was made privately and not in any judicial proceeding.

45. Mr. Thibodeau intentionally disclosed the contents of the oral communication to his counsel and others, knowing or having reason to know that the information was obtained through the interception of an oral communication in violation of 18 U.S.C. § 2511(1). Those disclosures were made outside any courtroom and before any court ruled on the recording.

46. Each of these Defendants violated 18 U.S.C. § 2511(1)(c). Plaintiff may recover from each under 18 U.S.C. § 2520.

**COUNT III: USE (18 U.S.C. §§ 2511(1)(d), 2520), AGAINST DEFENDANT THIBODEAU**

47. Plaintiff incorporates paragraphs 1 through 38.

48. Mr. Thibodeau intentionally used the contents of the oral communication by offering the recording, and having it played, in the custody case to gain advantage over Plaintiff. Federal

law bars receiving the contents of an unlawfully intercepted communication in evidence in any court proceeding. 18 U.S.C. § 2515. He knew or had reason to know that the information was obtained through the interception of an oral communication in violation of 18 U.S.C. § 2511(1).

49. Plaintiff may recover from him under 18 U.S.C. § 2520.

**COUNT IV: D.C. WIRETAP STATUTE (D.C. CODE §§ 23-542, 23-554), AGAINST DEFENDANTS FREEMAN AND THIBODEAU**

50. Plaintiff incorporates paragraphs 1 through 38.

51. In the District of Columbia, Ms. Freeman willfully intercepted Plaintiff's oral communication, D.C. Code §§ 23-541(2)–(3), 23-542(a)(1). She also willfully disclosed its contents to Mr. Thibodeau, § 23-542(a)(2).

52. In the District of Columbia, Mr. Thibodeau willfully disclosed and used the contents of the oral communication, knowing or having reason to know that the information was obtained through the interception of an oral communication. D.C. Code § 23-542(a)(2)–(3).

53. Under D.C. Code § 23-554(a), Plaintiff may recover from each of these Defendants who intercepted, disclosed, or used her communication actual damages, but not less than liquidated damages of $100 a day for each day of violation or $1,000, whichever is higher. She may also recover punitive damages and litigation costs.

**COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AGAINST DEFENDANTS THIBODEAU AND FREEMAN**

54. Plaintiff incorporates paragraphs 1 through 38.

55. While a court order required him to stay away from Plaintiff's home and forbade him to contact her even indirectly through a third party, Mr. Thibodeau carried out a course of conduct directed at her, outside any courtroom. He had her landlord and neighbor watch for her at her home and report to him. He came to her home and entered it over her refusal. He took her pets. He obtained a secret recording of her with her daughters inside her home. He was still receiving reports from her landlord about her activities at her home six weeks later. He did all of

this knowing that the CPO forbade him to contact Plaintiff "indirectly through a third party." No custody order directed or authorized any of it.

56. This conduct was extreme and outrageous. It was directed at a person a court had ordered him to stay away from, and it reached into her home. It was a course of conduct of the kind the District of Columbia defines as stalking: on two or more occasions, "directly or indirectly, or through one or more third persons," to "[f]ollow, monitor, place under surveillance . . . or communicate to or about another individual," and to "take, or unlawfully enter an individual's real or personal property." D.C. Code § 22-3132(8)(A)–(B); *see id.* § 22-3133(a).

57. Ms. Freeman joined in that course of conduct knowing that it was directed at a woman a court had protected from Mr. Thibodeau. Plaintiff had given her the CPO precisely so that she would know he was barred from Plaintiff's home. Ms. Freeman nonetheless used her position as Plaintiff's landlord and across-the-hall neighbor to watch Plaintiff at her home and report her presence and movements to him, on January 20, 2025, and again on March 3, 2025. She recorded Plaintiff inside her home with her daughters and handed the recording to the very man the CPO kept away. She abused a position of trust and control over Plaintiff's home, and she disregarded a vulnerability she knew of because Plaintiff had disclosed it to her for her protection.

58. Each of these Defendants acted intentionally, or recklessly, in causing Plaintiff emotional distress.

59. Plaintiff suffered severe emotional distress as a result. Defendants' conduct caused or substantially contributed to the post-traumatic stress disorder with which she was diagnosed in March 2025. She has been in therapy since March 2025. She suffers from sleep problems and panic attacks. She became afraid to return to the Apartment, her own home, and for that reason she moved out as quickly as she could. She left Washington, D.C., a city she had loved, and left behind close friends and relationships. She has also suffered ongoing anxiety, humiliation, and grief.

**COUNT VI: TRESPASS, AGAINST DEFENDANT THIBODEAU**

60. Plaintiff incorporates paragraphs 1 through 38.

61. On January 20, 2025, Plaintiff was the tenant in possession of the Apartment. No writ of restitution had been executed, and her belongings and pets were inside.

62. Mr. Thibodeau intentionally entered the Apartment without Plaintiff's consent and after she had expressly refused it, while a court order barred him from coming within 100 yards of her home. The officers' permission was not Plaintiff's consent: they had no authority to give it on her behalf, and he knew she had not given it. (Paragraphs 29–32.)

63. Plaintiff is entitled to nominal, compensatory, and punitive damages.

**COUNT VII: CONVERSION, AGAINST DEFENDANT THIBODEAU**

64. Plaintiff incorporates paragraphs 1 through 38.

65. Plaintiff owned the two cats and the rabbit that lived with her in the Apartment, and their supplies and equipment. At a minimum, she had possession of them and the immediate right to possess them, which Mr. Thibodeau did not have.

66. On January 20, 2025, Mr. Thibodeau took them without her consent and has kept them. No court order authorized him to take or keep them. He exercised unlawful dominion and control over her property in denial of her rights.

67. Plaintiff is entitled to the return of her animals and their belongings or their value, and to damages.

**COUNT VIII: UNLAWFUL ENTRY (42 U.S.C. § 1983; U.S. CONST. AMEND. IV), AGAINST DEFENDANTS MORENO AND TRAN**

68. Plaintiff incorporates paragraphs 1 through 38.

69. Acting under color of law, Officers Moreno and Tran allowed and enabled Mr. Thibodeau to enter Plaintiff's home without her consent, over her express refusal, without a warrant authorizing his entry, and without exigent circumstances.

70. Plaintiff told the officers that she had a protection order against Mr. Thibodeau and that he was not to enter her home. The bench warrant authorized only her arrest, and the custody order authorized only assistance in retrieving the children. Neither authorized a private person's entry into her home. It has been clearly established since *Wilson v. Layne*, 526 U.S. 603 (1999), that officers executing an arrest warrant in a home violate the Fourth Amendment when they bring in or admit a third party whose presence does not aid in executing the warrant. Mr. Thibodeau's entry did not aid in executing the warrant: it occurred after the warrant had been executed and Plaintiff removed. Under *Wilson*, *Payton v. New York*, 445 U.S. 573 (1980), *Soldal v. Cook County*, 506 U.S. 56 (1992), and *Caniglia v. Strom*, 593 U.S. 194 (2021), which rejected any "community caretaking" exception for entries into a home, no reasonable officer, told these facts, could have believed that allowing Mr. Thibodeau into her home was lawful.

71. The entry was an unreasonable search of Plaintiff's home in violation of the Fourth Amendment. Plaintiff may recover under 42 U.S.C. § 1983. No administrative remedy, including a complaint to the Office of Police Complaints, is a prerequisite to this claim.

**COUNT IX: UNLAWFUL SEIZURE (42 U.S.C. § 1983; U.S. CONST. AMEND. IV), AGAINST DEFENDANTS MORENO, TRAN, AND THIBODEAU**

72. Plaintiff incorporates paragraphs 1 through 38.

73. Plaintiff's animals and their supplies and equipment were her "effects" under the Fourth Amendment. She owned them, and at a minimum she had a possessory interest in them, kept in her home.

74. Acting under color of law, Officers Moreno and Tran meaningfully interfered with Plaintiff's possessory interest in that property: they authorized, oversaw, and enabled its removal from her home by Mr. Thibodeau, rather than leaving it secured or allowing Plaintiff to arrange its care. *See Soldal v. Cook County*, 506 U.S. 56 (1992). The seizure served no caretaking need. The animals were in their own home, and by the officers' own account, the alternative was a shelter from which Plaintiff could have reclaimed them, not a transfer to the one person a court

had barred from her home. Handing a protected person's property to the person she is protected from is not caretaking. *See Caniglia v. Strom*, 593 U.S. 194 (2021).

75. Mr. Thibodeau acted jointly with the officers, using their presence and permission to enter the Apartment and take the property. He is liable under 42 U.S.C. § 1983 as a willful participant in joint action with state actors. *See Dennis v. Sparks*, 449 U.S. 24 (1980).

76. The seizure was unreasonable and violated the Fourth Amendment. Plaintiff may recover under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiff asks the Court to enter judgment for her and against Defendants, and to award:

A. Against Defendants Freeman and Thibodeau, each, statutory damages under 18 U.S.C. § 2520(c)(2) of the greater of $100 a day for each day of violation or $10,000, or actual damages if greater;

B. Against Defendants Freeman and Thibodeau, each, damages under D.C. Code § 23-554(a)(2)(A);

C. Compensatory damages on Counts V through VII;

D. Against Defendants Moreno, Tran, and Thibodeau, nominal and compensatory damages under 42 U.S.C. § 1983 on Counts VIII and IX;

E. Punitive damages under 18 U.S.C. § 2520(b)(2), D.C. Code § 23-554(a)(2)(B), 42 U.S.C. § 1983, and District of Columbia common law;

F. A preliminary and permanent injunction under 18 U.S.C. § 2520(b)(1). It should prohibit Defendants Freeman and Thibodeau, and those acting in concert with them, from disclosing or using the recording or its contents outside of a judicial proceeding, including every portion that depicts or records S.T. and L.T. Except as a court in a

pending proceeding may direct, it should also require them to deliver to Plaintiff, or destroy, every copy in their possession, custody, or control;

G. An order requiring Mr. Thibodeau to return Plaintiff's two cats, her rabbit, and their supplies and equipment, or to pay their value;

H. Costs, and reasonable attorney's fees under 18 U.S.C. § 2520(b)(3) and 42 U.S.C. § 1988 should Plaintiff retain counsel; and

I. Such other relief as is just.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

**Exhibits filed with this Complaint (redacted under Fed. R. Civ. P. 5.2):**

A. Civil Protection Order, *Smallwood v. Thibodeau*, No. 2023 CPO 001682 (D.C. Super. Ct. Aug. 21, 2023).

B. Excerpts, Trial Tr., *Thibodeau v. Smallwood*, No. 2023 DRB 001142 (D.C. Super. Ct. May 1, 2025), pp. 3, 86–91, 130–135, 192–197.

C. Excerpts, Hr'g Tr., No. 2023 DRB 001142 (D.C. Super. Ct. Jan. 15, 2025), pp. 2–3, 7, 10; (Jan. 16, 2025), p. 6; (Jan. 21, 2025), pp. 5–7; (Feb. 3, 2025), p. 7; and (Mar. 3, 2025), p. 6.

D. Excerpt, Trial Tr., No. 2023 DRB 001142 (D.C. Super. Ct. May 2, 2025), p. 60.

E. Temporary Protection Order, *Smallwood o/b/o S.T. v. Thibodeau*, No. 2024 CPO 004508 (D.C. Super. Ct. Dec. 3, 2024), extended Dec. 17, 2024, to Jan. 28, 2025.

F. Email from Lt. Zunnobia Hakir, MPD Fifth District, to Plaintiff (Jan. 26, 2025).

G. Plaintiff's November 2024 correspondence concerning her rabbit's cage and food.

Respectfully submitted,

[signature]

Tai Y. Smallwood, Plaintiff, pro se
9A Rue Saint Antoine, 13002 Marseille, France
U.S. mailing address: 14 Duchess Court,
Rosedale, Maryland 21237
(707) 696-4985 | taiysmallwood@gmail.com

Dated: October 21, 2026

## VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the factual allegations of this Complaint are true and correct to the best of my knowledge, information, and belief. Allegations describing Defendants' statements, knowledge, and conduct are based on the sworn testimony and statements cited in the Complaint and, as to what I said to and was told by Officers Moreno and Tran, on my personal knowledge. Allegations made on information and belief are identified as such.

Executed on October 21, 2026, at Marseille, France.

____________________________

Tai Y. Smallwood